```
                        UNITED STATES DISTRICT COURT
 1                       FOR THE DISTRICT OF COLUMBIA
 2    ---------------------------X

 3     UNITED STATES OF AMERICA

 4                 v.              Criminal Case 21-330-JEB

 5    JONATHAN MUNAFO,

 6              Defendant

 7    ---------------------------X
                                    Washington, D.C
 8                                  Tuesday, May 17, 2022
                                    10:00 a.m.
 9
               TRANSCRIPT OF A VIDEO STATUS CONFERENCE
10             BEFORE THE HONORABLE JAMES E. BOASBERG
                    UNITED STATES DISTRICT JUDGE
11    APPEARANCES:

12    For the Government: Sean P. Murphy, AUSA
                          U.S. ATTORNEYS OFFICE
13                        District of Puerto Rico
                          Torre Chardon, Suite 1201
14                        350 Carlos Chardon Avenue
                          San Juan, PR 00918
15                        (787) 766-5656

16

17    For the Defendant:  Kevin Lerman, AFPD
                          FEDERAL PUBLIC DEFENDER
18                        District of Puerto Rico
                          241 F.D. Roosevelt Ave
19                        San Juan, PR 00918-2441
                          (787)281-4922
20

21

22

23    Court Reporter     Lisa Walker Griffith, RPR
                          U.S. District Courthouse, Room 6507
24                        Washington, D.C.  20001
                          (202) 354-3247
25
```

**P R O C E E D I N G S**

THE COURTROOM DEPUTY: Your Honor, we are on the record in criminal case 21-330. *United States of America versus Jonathan Munafo.*

We have Mr. Andre Sidbury from Pretrial Services who is also present. And I'm going to start with government counsel. Please state your name for the record.

MR. MURPHY: Good morning, Your Honor. Sean Murphy on behalf of the United States.

THE COURT: Good morning.

MR. LERMAN: Good morning, Your Honor. Kevin Lerman representing Jonathan Munafo.

THE COURT: All right. Mr. Munafo, can you see and hear me okay?

THE DEFENDANT: Yes, Your Honor. Good morning.

THE COURT: All right. Good morning to you.

So, Mr. Murphy or Mr. Lerman, can you tell me what happened in Michigan in regard to your motion? I think I'll start with, Mr. Lerman, your motion filed there for release. Can you give me -- has anything happened since we were last here?

MR. LERMAN: Your Honor, that motion was referred to a magistrate for a detention hearing. When I last checked yesterday, it hadn't been scheduled. I can update that now because I -- yeah, the last entry, Your Honor, was that it

1    was referred to a magistrate.

2            THE COURT: Okay. So do you want to have that

3    hearing first? We sort of talked last time about what order

4    made more sense. Do you want to do that one first or do you

5    want to go forward here? Because obviously, even if I

6    released him and then he's detained in Michigan, then that

7    really just doesn't do any good. In fact, you would want a

8    money bond here, I would think, so he gets some credit.

9            So that was sort of the issue we raised last time,

10   but I'll hear you on that.

11           MR. LERMAN: We would ask to proceed, Your Honor.

12   As we mentioned last time, the main purpose of our request,

13   since we are requesting that he be released to a very

14   structured pretrial environment in the Western District of

15   Michigan, that is to continue to address his mental health

16   needs.

17           He has been doing very well, and he is facing a

18   complex combination of cases. So I think the sooner that

19   he's in that environment where he can receive more

20   personalized treatment with the expertise of Pretrial

21   Services, then the sooner that he'll be able to work toward a

22   resolution in this case and the other case.

23           Especially since now that we've seen that the

24   government's submission, we think that that actually further

25   supports release. We do think it would be appropriate to

1   address the detention hearing.

2   THE COURT: All right. I'm happy to do it, and I'm
3   quite interested to hear why you think the government's memo
4   supports release, because it seemed pretty strong the other
5   way to me.

6   MR. LERMAN: If you'd like, Your Honor, I would be
7   happy to begin with that, because we do see that memo. After
8   essentially 17 months of investigation of Mr. Munafo, we have
9   somebody looking at the cases in which judges found release.

10   We do see the facts in this case to where there's no
11   allegation that Mr. Munafo is responsible for an injury to
12   anyone, that he went to D.C. alone, that he walked to the
13   Capitol alone, that he brought no weapons. He brought no
14   protective gear. He made no attempt to conceal his identity.

15   He's not a member of any organized group. He's part
16   of the thousands of people there in support of political
17   action. I think a really good case to look at for when
18   release was kind of a close question is the case of *Webster*.
19   That's at 21CR208.

20   There, the defendant there had injured a police
21   officer, brought a gun to the Capitol. He brought a flag
22   pole with him. He had special skills. He was strong and
23   used to physical combat. And the judge looked at it, heard a
24   victim impact statement, which we don't have here. We have a
25   statement from an officer saying, I was being fooled right

1   here.  I couldn't even tell who touched me at that time, and
2   I didn't feel any pain from that interaction.
3           Now, we're not trying to minimize any of the
4   allegations against Mr. Munafo, but when we have a case like
5   *Webster* where there is that release because the Court said,
6   Look, I'm not here to decide guilt or innocence.  I'm here
7   for this narrow analysis under the Bail Reform Act that has a
8   preventive detention allowed for me on a narrow range of
9   individuals.  We also have --
10          THE COURT:  Let me stop you.  I'm going stop you for
11  one second.  Obviously, the criminal history and flight risk
12  issues are much, much worse for your client than they are in
13  a number of these other cases.  But the one place where you
14  make a little headway, and that's why I want talk to
15  Mr. Murphy, is the actions of the defendant on the day.
16          So what I have, Mr. Murphy, all I see is on top of
17  17, first paragraph and I carry over to onto 17 because I go
18  back.  There's sort of -- the actions on January 6th through
19  pages 9 and 10, there really isn't anything.  It's really
20  sort of about pre-January 6th.  And then you move on to 13,
21  the post-January 6th.
22          So it's a little, actually to find his conduct, I've
23  got to do a little digging.  And I find there's sort of the
24  three sentences on the top of 17.  So, maybe you can give me
25  a little more description of his actual conduct during the

1   insurrection.

2           MR. MURPHY:  Yes, Your Honor.  I'm more than happy
3   to do so.  I do want to apologize to the Court for the
4   eleventh hour minute filing of the detention memo.  It was
5   actually not my intention initially to file one of these, but
6   the key reason why I felt yesterday that I did need to file
7   one and make it as strong as possible was I read defense
8   counsel's motion in the Michigan case, the Motion for
9   Release, which was filed yesterday.

10          And I was somewhat astonished to find that, in two
11  places in that motion, they made the claim that this Court,
12  specifically the District of Columbia, was inclined to
13  release the defendant.  And that there are grounds for asking
14  for that detention hearing in Michigan was because the
15  District of Columbia was -- seemed willing to release him,
16  but they didn't want to release him here so that -- because
17  then he would have the detainer there.

18          So it was almost the exact same thing that this
19  Court had heard previously.  But it was being told to the
20  Michigan Court which -- I mean honestly, it upset me a bit,
21  because I felt like the Courts are being played off each
22  other.  But then also it lit the fire to write that detention
23  memo yesterday, which I can see was a bit -- I could have
24  taken more time to polish it.

25          THE COURT:  No worries.

1             MR. MURPHY:  I apologize for it.
2             THE COURT:  I've seen plenty less polished than
3    this.  So that's fine.  So why don't you just get me to
4    January 6th, and tell me some specifics as best you can on
5    his conduct on that day.
6             MR. MURPHY:  Absolutely, Your Honor.  With the
7    Court's permission, I would like to actually show the Court.
8             THE COURT:  Great.  If you've got photos or videos,
9    I'd be delighted to see them.
10            MR. MURPHY:  And I will file these.  I'll provide a
11   notice of filing after this hearing pursuant to Judge
12   Howell's order.  And for the record, I have no objection to
13   the public release of these videos.
14            THE COURT:  Okay.
15            MR. MURPHY:  So this first video is an open source
16   video.  I'll stop it when the defendant can be seen.  He's
17   towards the edge of the screen.
18            (Video shown)
19            MR. MURPHY:  So I'll actually back it up a little
20   bit.  But are you able to see my cursor on the screen?
21            THE COURT:  Yes, I am.
22            MR. MURPHY:  This is the defendant, Mr. Munafo,
23   right here.  He had actually just punched the officer right
24   before I paused it.  So I'll back it up just a little bit to
25   about 25 seconds in.  But there's an individual with the

1  shaved head and a beige jacket who seems to have his hands on
2  the shield.  He'll let go.  Then Mr. Munafo is right there.
3              THE COURT:  Okay (video resumed).
4              MR. MURPHY:  He can be seen there holding the shield
5  up over his head.
6              Sorry, he was on the screen for just a minute right
7  there.  So he can be seen with this plastic riot shield that
8  he had just dropped from the police officer (video resumed).
9              So that would be Government's Exhibit 1.
10             I will now show Government's Exhibit 2, which will
11 be the video produced by the FBI for the defendant's
12 identification which I believe was BOLO or should be on the
13 lookout for this individual whose mark is 170.
14             (Video resumed)
15             MR. MURPHY:  So that was the Government's Exhibit 2,
16 which again was the, for the record was the FBI produced
17 video.
18             Government's Exhibit Number 3, which will be an open
19 source video, which shows an overhead view.  Defendant, in
20 this video, will be seen attempting to smash out one of the
21 windows on the west side of the Capitol with a flag pole.  It
22 will be in this area.
23             THE COURT:  All right.  Let's see it.
24             (Video resumed)
25             MR. MURPHY:  So he raises his fist above his head,

1    takes the flag pole with the American flag attached, and
2    strikes the (inaudible) Capitol several times.
3            Those are the three exhibits that I have for the
4    Court.
5            THE COURT:  Okay.
6            MR. MURPHY:  Regarding his conduct on January 6th.
7    I do have one video I was able to get recently from the
8    assault from Lynn, Massachusetts, for the Court.
9            THE COURT:  Sure.
10           MR. MURPHY:  Screen shots of it.
11           THE COURT:  Sure, I'd be happy to see that.
12           MR. MURPHY:  I think it is relevant because this
13   punching of strangers and assaults and spitting at and
14   behavior towards law enforcement does have a certain level of
15   consistency through his behavior.  So, with that, I'll show
16   Government's Exhibit 4.
17           He enters the screen in this bottom left corner
18   here.
19           THE COURT:  This occurs when?
20           MR. MURPHY:  This was in November of 2020, just a
21   few days after then President Donald Trump lost the election.
22   And he was there with a sign that, I believe I mentioned in
23   the detention memo, said that, The no longer silent majority
24   stands for Trump.
25           (Video shown)

1           MR. MURPHY:  So that was Government's Exhibit Number
2    4.
3           THE COURT:  Okay.  All right.  So, Mr. Lerman, back
4    to you.  In other words, what -- I understand there's some
5    obvious mental health issues here.  And I'm really glad, Mr.
6    Munafo, that you're getting some of that seen to and that
7    you're in a much better position than you were.  I think that
8    that's terrific from lots of standpoints.
9           Mr. Lerman, you've got an uphill battle, though,
10   because conduct on January 6th, as those videos show, is
11   egregious.  Criminal history is extremely concerning, and the
12   conduct in multiple locations around the country is also
13   alarming to me.  So I'm happy to hear you, but you've got
14   your work cut out for you.
15          MR. LERMAN:  Thank you, Your Honor.  I'd like to
16   just begin there with how that concern fits to the proof,
17   because the Court looks to whether there's prospective
18   danger, a future danger, if he's released, and whether
19   conditions can be fashioned to address that.
20          I think that one of the key things to think about
21   with this case with the discussion of criminal history, what
22   we saw was -- the last video that we saw was a portion of an
23   interaction where that took place about two months before the
24   January 6th incident.
25          We do have law enforcement contacts in 2020 and

1   2021.  We do know that he is not a lost cause for addressing

2   mental health issues, and I have seen throughout my over a

3   year representing Mr. Munafo, a marked change, based not just

4   on medication, but he also sits in quiet reflection, in

5   meditation.

6           I've sent him meditation materials that are part of

7   his spiritual practice.  He has this demonstrated time in the

8   community at now 35 years old where you have this accutime

9   (ph) period where there's issues coming up.

10          Also, during the pandemic, when I think it's

11  undisputed by anyone that the pandemic has really exacerbated

12  mental health issues for a lot of people, and especially

13  someone like him, who has worked as a contractor, which is in

14  the Pretrial Services report.  He's worked in jobs repairing

15  appliances.  He also was a partner in a business that

16  transported lab materials in the medical field.

17          And that's how we see that he doesn't have any

18  issues with law enforcement in 2019, 2018, 2017, 2016.

19  There's a brief contact in 2015 following a car crash.  So

20  there's a traffic issue.  Then between 2008 and 2015, we

21  don't see any issues.  So we have far over a decade without

22  any law enforcement contacts.

23          And in his earlier criminal history, it is

24  quantitatively mentioning mental health and conflicts with

25  severely abusive family members.  That's why he does have

1    criminal history starting as a teenager.  So we have this
2    trajectory.  And we have a very treatable collection of
3    conditions for an otherwise very intelligent young man who
4    has a lot of potential.
5             It is an uphill battle.  It's not just an uphill
6    battle for me to explain.  He has an uphill battle to deal
7    with this case, to deal with the case in Michigan and to deal
8    with some other outstanding cases throughout the country that
9    he has to begin that somewhere.
10            I think that one of the things that would be useful
11   to provide the Court, and I can submit this after the hearing
12   as well, but the Pretrial Services office in Grand Rapids,
13   which is where his other case is being handled, they post
14   materials about what their officers do to enforce conditions
15   related to mental health.
16            They're trained to deal with mental health.  The
17   facility that we're proposing that he be placed in, CAPE Up
18   (ph), is actually used, they have several different services.
19   They provide probation and pretrial, and it's used as a
20   residential reentry center.  So it has video cameras
21   throughout the hallways, throughout the facility.  It's
22   locked at night.  It's a place that's used to dealing with
23   people that are on pretrial.
24            What's been described to the Court is potentially, I
25   think even bidding with the government's theory of what's

1     going on here, what's being alleged is maladaptive behavior.
2     That fits squarely within what Pretrial Services can address
3     in terms of even dealing with impulse control, impaired
4     judgment, assisting people under supervision to get the right
5     combination of medications.
6              He really turned a corner once he was at a stable
7     facility in January.  And I would like to note for the Court,
8     and I can submit proof of this as well, but there's an
9     allegation from the government in the memo submitted this
10    morning, that he has an open case in Oklahoma.
11             Why was he in Oklahoma for this case in D.C. and
12    Michigan?  Because he had been transferred there twice for an
13    extended period.  And there was an allegation from one of the
14    guards at a time when he was being detained that there's this
15    allegation that he transferred fluid to this officer.  That
16    that sounds -- you know, that sounds like a terrible
17    allegation.  It's not pending.  That case has been dismissed.
18    And we can provide the Court proof of that.
19             So, I would also like to note, he's been in custody
20    for over a year.  The government says he's looking at a
21    serious potential period of time.  But we do have -- you
22    know, I think the gravamen of the charges here is the alleged
23    assault, which could very well be in a guideline range of
24    simple assault where he would be found guilty or enter a plea
25    in the case.  And he could very well be at time served.  He

1    could be at time served on both cases.

2            So any issues that would make a person want to flee,
3    even any concern about being a danger or a flight risk would
4    be dealt with so quickly during the -- our request is only
5    for a very secured facility, even more secure than in the
6    case that I mentioned, that of -- I'm sorry.  That of, it's
7    21-208, where that defendant who was involved in a very
8    serious assault was put on home detention.  This is far more
9    secure.  This is pretty much jail, but with slightly more
10   liberty possibilities and increased mental health care.  I
11   think --

12           THE COURT:  All right.  I think I get the gist of
13   what you're saying.  I appreciate your zealous argument on
14   Mr. Munafo's behalf.  But I don't think this is a
15   particularly closed case still.

16           Again, I'm hopeful, Mr. Munafo, that this mental
17   health treatment is helping you and that you are in a
18   different place than you were.  But, wow, you sure were
19   engaging in a whole host of conduct that is hard for me to
20   understand.  Different states, different people, different
21   victims, I just can't find that I can trust you to release
22   you.

23           Again, I hope you're better and maybe you'd be fine.
24   But I just don't see that you've met that burden.  And the
25   government, which does bear the burden of proof in detention,

1    certainly has shown by clear and convincing evidence that the
2    defendant would be both a flight risk and danger to the
3    community if released.  I rely on his conduct on January 6th,
4    which, as shown in the videos, is very significant.
5             Although, Mr. Lerman, you're saying he could get a
6    time served sentence, and you are certainly right.  He's
7    facing 10 counts including civil disorder which is a serious
8    offense, weapons charges, engaging in physical violence.  He
9    might get time served, but he might get a lot more than that.
10   Plus you have the Michigan case, plus the other conduct is
11   just too significant for me here to order release.
12            It is clear that I cannot find that there are
13   conditions that would ensure the safety of the community and
14   his return to Court, so I will grant the government's motion
15   to detain the defendant without bond.
16            So what do you want to do in terms of next steps,
17   Mr. Lerman?  Did you talk to the government about whether you
18   want to reach some global resolution or whether you want to
19   proceed on these two tracks?  Whatever you would like is fine
20   with me.  But I guess we've got to finish up in Michigan
21   before he can be released to come here.
22            MR. LERMAN:  We continue to discuss the case with
23   the government.  It was the government that had mentioned
24   last year the possibility of making an offer to us, a joint
25   resolution to resolve both matters, which is potentially

1  something that we could move for under Rule 20.  I think that
2  Rule 20 and the notes to Rule 20, I think, contemplate the
3  difficulty of the situation that Mr. Munafo is in right now.
4       We do hope to engage in some kind of fruitful
5  discussion with them.  But I think we would just propose that
6  we submit another -- I think we may have a pending joint
7  status report.
8       THE COURT:  Just looking at the docket.  Yes, you're
9  right.  May 31st, you're right.  May 31st is the next joint
10 status report.  So I'm happy to -- you want to extend that,
11 you want to leave it?
12      MR. MURPHY:  If I may, Your Honor, I would
13 recommend, from the government's point of view, that we
14 extend that, especially since we know now that his -- well,
15 given Your Honor's decision, it's unlikely that his -- I'll
16 withdraw that.
17      He does have the pending detention hearing that was
18 referred to the magistrate judge in Michigan.  But it does
19 appear that he still has the trial set for June 28th.  I
20 would recommend --
21      THE COURT:  For Michigan, the trial is set for then?
22      MR. MURPHY:  Yes.  The jury trial is set for June
23 28, 2022 at 9:00 a.m.
24      THE COURT:  What are you proposing?
25      MR. MURPHY:  We would recommend a joint motion

1   perhaps soon thereafter, early July, that would inform the
2   Court either if that's been continued or resolved.
3           THE COURT:  Mr. Lerman?
4           MR. LERMAN:  That's fine with us, Your Honor.
5           THE COURT:  Okay.  All right.  How about let's say
6   July 8th, joint status report due July 8th?
7           MR. MURPHY:  That works for the government.  Thank
8   you, Your Honor.
9           MR. LERMAN:  That works for us as well.
10          THE COURT:  Any objection to excluding time,
11  Mr. Lerman?
12          MR. LERMAN:  Not at this time.
13          THE COURT:  Find that in the interest of justice to
14  exclude time between today and July 8, 2022.
15          Ms. Franklin, if you'll note that's the date for the
16  next joint status report please.
17          Thank you.  Anything else today for the government?
18          MR. MURPHY:  Not at this time, Your Honor.  Thank
19  you.
20          THE COURT:  Mr. Lerman?
21          MR. LERMAN:  No.  Thank you, Your Honor.
22          THE COURT:  All right.  Thank you.  Mr. Munafo,
23  we'll see you in early July, and good luck with continued
24  recovery.  Thank you very much.
25          (Proceedings concluded at 10:32 a.m.)

CERTIFICATE OF REPORTER

I, Lisa Walker Griffith, certify that the foregoing is a correct transcript from the record of the remotely reported proceedings in the above-entitled matter, and is subject to the technological limitations of court reporting remotely, including signal interference and other restrictions.

_____   7-1-22
Lisa Walker Griffith, RPR                Date