**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**,<br>*Plaintiff,*<br><br><br>v.<br><br>**JONATHAN J. MUNAFO**,<br>*Defendant.* | **SENTENCING MEMORANDUM**<br>**& DOWNWARD-VARIANCE MOTION**<br>**21cr330 (JEB)** |

***During the 2020 election season,*** Jonathan was a "Front Row Joe," camping at rally locations, waiting in lines to show support for President Donald J. Trump's reelection. *See* Right. When not attending political events, he drove a car showing political support messages.  ***On January 6,*** he joined thousands of people in Washington, D.C., at the Ellipse. He then joined the walk to the Capitol. He had traveled alone from Florida, leaving on the 5th, barely sleeping in the preceding days. Months of isolation had impacted Jonathan's mental wellbeing: he'd decompensated. 

In the Capitol melee, he violated the law: he twice punched Officer McAllister's body armor and faceguard, and he repeatedly banged on a Capitol window with a pole. Fortunately, this case saw no injuries. ***In April 2021, knowing he was unwell and wanted by authorities,*** Jonathan surrendered. He's stable now after 29 months. Under federal supervision, he'll get mental-health treatment and reentry assistance. Further imprisonment in the BOP stands to delay and undermine both treatment and security. Either "time served" or probation is warranted.

CONTENTS

BACKGROUND ............................................................................3

I.   THIS COURT SHOULD VARY DOWNWARD TO IMPOSE A SENTENCE OF
     29 MONTHS' "TIME SERVED" OR PROBATION.....................................15

     A.   This Court may see Jonathan as a CHC III offender with a
          consecutive 24-month Michigan sentence merely due to
          prosecutorial choices not related to § 3553(a)(1)..................16

     B.   If hard time can teach lessons, the government's choice
          of conditions put Jonathan on an accelerated course
          toward learning those lessons. ...........................................17

     C.   This offense is outside the heartland of the present
          GSR given a number of mitigating factors. ......................20

     D.   Jonathan needs treatment in the community and could
          suffer additional setbacks if transferred to the BOP. .......22

          1. Jonathan's need for treatment is established...............22

          2. Jonathan has achieved stability during treatment. ......23

          3. Jonathan has an imperfect yet established record of
             seeking help when needed. ...........................................23

          4. Release after 29 months to start community
             treatment will not leave any goals of sentencing
             unmet...........................................................................24

CONCLUSION ...........................................................................25

## Background

Jonathan Munafo is a 36-year-old man who was born in Massachusetts and has lived all over the United States.[1] Despite enduring a childhood rife with abuse, neglect, and trauma,[2] Jonathan obtained his GED at 16 years old,[3] and has maintained jobs in the community over the last 18 years[4] (minus the last 2-plus years' incarceration).

Jonathan, since he was child, was the subject of a number of legal and mental health interventions.[5] As the PSR notes, Jonathan's "mental health issues" "have had significant impact on his life when uncontrolled."[6] On January 6, "he was not medicated, and he lacked stable housing, employment, and income."[7]

Between this case, and a Western District of Michigan case,[8] based on unlawful telephone statements made on January 5, 2023, Jonathan has now been imprisoned over 29 months since he surrendered himself to law enforcement on April 13, 2021. Authorities first held Jonathan in Florida jails during the time he was appearing under Rule 5 in the Michigan case.[9] On April 23, 2021, the U.S. Probation Department recommended that Jonathan be released on an unsecured bond with requirements that he seek and obtain employment and submit to "mental health

---

[1] PSR ¶¶67-87.
[2] PSR ¶¶67-79.
[3] PSR ¶82.
[4] PSR ¶¶138-142.
[5] PSR ¶¶46-52, 55-65, 96-130.
[6] PSR ¶182.
[7] PSR ¶182.
[8] W.D. Mich. Case No. 21-cr-99-JTN.
[9] PSR 1.

evaluation and/or treatment as directed." [10] Federal prosecutors in Michigan, Washington, D.C., and Florida coordinated to proceed against him in this case, which would trail resolution in Michigan.

Before the Michigan case could be resolved, Jonathan was repeatedly shuttled between detention facilities. This was at the time of the pandemic when the federal and state governments provided diminished care to their wards. In terms of medical, mental health, and basic programming, and honoring of basic human rights, jails and prisons were operating on substandard levels. Jonathan languished in facilities throughout the country. More detail is provided below.[11]

In terms of his conduct at the Capitol, he traveled to Washington, D.C., as he had traveled to so many events in support of President Trump. As the parties agree, Jonathan then committed two felony offenses. The parties' stipulated facts are consistent with the presentence report.[12] Jonathan Munafo traveled to the Ellipse in Washington, D.C. on January 6, 2021. [13] The ellipse saw nearly three hours of programming on a stage facing the White House.

---

[10] M.D. Fl. Case No. 21mj1355 (pretrial services report at 5).
[11] Upon returning to mental stability in 2022, Jonathan resolved the Michigan matter and accepted responsibility.
[12] ECF No. 39; *see also* PSR ¶¶16-25.
[13] PSR ¶22.



Overwhelmed by the crowd and fatigued, Jonathan returned to his car toward the end of the programming. He tuned in to a livestream of the speeches from his cellular phone. He recalls many of the speech lines by Donald Trump, including the following: "I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard."[14]

He then walked to the Capitol to protest.

---

[14] Transcript of Trump's speech at rally before US Capitol riot, AP News, https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-media-e79eb5164613d6718e9f4502eb471f27.



Once there, around 3:21 p.m., Jonathan was amongst the crowd where barricades separated protesters from police. As seen on Officer Neil McAllister's body-worn camera footage, Officer McAllister, at 3:19, approached that line.



Moments later, Officer McAllister saw an older female protestor behind him.



McAllister then used his hands and physical body to move the woman and a man behind her toward other protesters.





Seconds later, someone handed McAllister a shield, which he held it in his left

hand as he and protesters helped a wounded officer[15] get through the crowd.



---

[15] PSR ¶¶23-24.





For reasons likely related to his stress response and mental health issues, Jonathan recalls feeling that Officer McAllister had physically hurt the older female protester moments before.



He punched Officer McAllister twice in his body armor and face shield.



An April 28, 2021 report summed up Officer McAllister's experience:

MCALLISTER was in the tunnel at first and was supporting other officers. At one point he was at the line of protesters and was handed a Capitol Police riot shield. Shortly after he received the shield an unknown individual tried to pull it away. While MCALLISTER was fighting over the shield another unknown individual struck him in his face mask approximately two times. The shield was then taken.

MCALLISTER didn't think he would be able to recognize the individual that struck him due to the short time frame of events. MCALLISTER remembered seeing facial hair on the subject. MCALLISTER's helmet and face shield protected him. MCALLISTER did not require medical attention and did not suffer an injury. MCALLISTER did not feel the punches due to the face shield and helmet.

Though it is of great relief that Officer McAllister experienced no pain or physical injury, these acts violated the law and violated Jonathan's own values. Jonathan also pulled on the shield as it was also being grabbed at the same time—as Officer McAllister noted, by another unknown person.



The crowd then passed around that shield and other shields.



According to the government, this riot shield was never recovered. Later, using a wooden flagpole with an attached flag, Jonathan struck the window of the U.S. Capitol 13 times with the flagpole.[16] (Image on next page.)

---

[16] PSR ¶25.



This conduct is a stark contrast from his First Amendment-protected activity, when he was rallying with Front Row Joes on the campaign trail.



And the images from January 6 show Jonathan's peculiar, decompensated affect observed on the eastern terrace.

 

## I.   THIS COURT SHOULD VARY DOWNWARD TO IMPOSE A SENTENCE OF 29 MONTHS' "TIME SERVED" OR PROBATION.

In objections, we've asked the Court to find Jonathan is in CHC I.[17] In CHC I, his advisory range is 24-30; otherwise, it's 30-37. If this Court makes a relevant conduct adjustment for the 24-month Michigan sentence, then a guideline sentence is close to "time served" since he's been in custody over 29 months. If a concurrent, partially concurrent, or adjusted sentence is not granted by the Court, the 18 U.S.C. § 3553(a) factors militate in favor of a probationary sentence or, alternatively, one of "time served" in order to reach a "sentence sufficient, but not greater than necessary, to comply" with the general purposes of sentencing." 18 U.S.C. § 3553(a). In determining an appropriate sentence, the Court considers numerous factors from § 3553(a)(1) through (7).

Though the Guidelines are an important factor in the sentencing analysis, they are only advisory, and the Court is generally free to impose non-Guidelines sentences. *United States v. Gall*, 552 U.S. 38 (2007); *United States v. Booker*, 543 U.S. 220 (2005). This authority is consistent with the fundamental principle that a sentencing court should consider the full scope of a person's life in an effort to sentence the individual as opposed to the crime: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,*

---

[17] ECF No. 41.

518 U.S. 81, 113 (1996).  Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams v. New York,* 337 U.S. 241, 247 (1949). The Supreme Court encourages sentencing courts to exercise great discretion in imposing a just and fair sentence.  *See e.g., Spears v. United States,* 555 U.S. 261 (2009); *Rita v. United States,* 551 U.S. 338 (2007); *Kimbrough v. United States,* 552 U.S. 85 (2007).

A combination of four factors supports a sentence with no further imprisonment. As we demonstrate in the sections that follow, imposing a probationary or other below-Guidelines sentence on Jonathan Munafo will be sufficient but not greater than necessary to achieve the goals enumerated in § 3553(a). **First,** prosecutorial choices inflated his CHC and may result in an arbitrarily consecutive 24-month Michigan term. **Second,** his confinement and prison transfers resulted in unusually severe conditions and delayed mental health treatment. **Third,** the offenses of conviction involve a number of mitigating factors. **Fourth,** Jonathan needs supervised mental health treatment in the community, which will be a condition of probation or supervised release.

### A. This Court may see Jonathan as a CHC III offender with a consecutive 24-month Michigan sentence merely due to prosecutorial choices not related to § 3553(a)(1).

As our objections point out, Jonathan was sentenced in the Western District of Michigan and has never had the opportunity to show he benefited from this time he was imprisoned or under supervised release. He has not even started the three-year supervised release term imposed in the Western District of Michigan.

Throughout 2021, the government indicated it was "attempt[ing] to tender a global plea offer to resolve both the W.D. Michigan case and this one."[18] Were this to have happened, Jonathan would have faced both charges with a CHC of I and would have received more favorable consideration for concurrency. After all, the default rule under 18 U.S.C. § 3584(a) is for "[m]ultiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively."

**B. If hard time can teach lessons, the government's choice of conditions put Jonathan on an accelerated course toward learning those lessons.**

The hard-learned lessons a court may wish for incarceration to teach have surely been pummeled into Jonathan over the last 29 months at a pace and manner not contemplated by the Sentencing Guidelines. Jonathan's confinement across five separate states with at least 10 interstate transfers supports a conclusion that time-served is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. 18 U.S.C. § 3553(a).

Jonathan Munafo was arrested in April 2021 in Florida. Since that date he has remained in the continuous custody of the United States Marshals. During this pro-longed period of detention, Jonathan has experienced the horrible living conditions at the multiple jails and detention centers he has been confined.  He was subjected to "diesel therapy" during the period in which he was being shuttled back and forth between Seattle, Washington, and the Western District of Michigan for mental health

---

[18] ECF No. 14 at 2.

evaluations. Take his first half a year of incarceration. After his April 13 surrender, police moved Jonathan to the Volusia County Branch Jail. Later they moved him to the Orange County Jail in Orlando.

He wasn't taken straight to Michigan, but to Chickasaw, Oklahoma, where he was held in a county jail from May through June. Given numerous considerations (i.e., the favorable outlook from U.S. Probation's pretrial services report, Jonathan's mental health needs, lack of any injury alleged in the case), the defense moved for a detention hearing in this case before his removal to Michigan. This Court ordered his transfer stayed.[19] The U.S. Marshals moved him anyway—to Chickasaw, Oklahoma.[20] He was there through June 9 with limited access to his attorneys and limited access to mental health treatment.

He was then transferred to White Cloud, Michigan, around June 6, 2021. Six days after his arrival in Michigan, on June 15, 2021, Magistrate Judge Ray Kent sua sponte ordered him "committed for evaluations regarding competency and sanity."[21] While the court's order called for evaluation within 45 days, it took almost 20 days just to transfer Jonathan to a facility in Washington State in order to carry out the judge's sua sponte order.

By Fall 2021, Jonathan was still being kept in Washington State.[22] The June evaluation order was not fulfilled until November. Proceedings eventually began in

---

[19] ECF No. 8.
[20] ECF No. 11 at 1.
[21] W.D. Mich. Case No. 21-cr-99-JTN, ECF No. 14.
[22] ECF No. 14.

Michigan in late November 2021. At that point, Jonathan had gone through Oklahoma three times before arriving in Michigan for a second time. He eventually concluded his Michigan case, was transferred back through Oklahoma, enduring a stay in Northern Neck, Virginia, and has been kept at the D.C. Detention Center since March, 2023.

His early imprisonment had a pronounced isolating effect given the delay in confronting the charges which were keeping him imprisoned. And people suffering mental health issues were still disproportionately being affected by pandemic-related isolation. "'Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and, in some cases, develop psychiatric disturbances.'" *United States v. López*, 327 F. Supp. 2d 138, 144-45 (D.P.R. 2004) (citation omitted). Even before the Guidelines were made advisory, it was permissible for courts to depart downward based on the severity of presentence confinement "in the proper case." *See United States v. Shah*, 263 F. Supp. 2d 10, 35 (D.D.C. 2003). The Eleventh Circuit remanded in an instance where the sentencing court found a twenty-three-hour lockdown during protracted pre-sentence confinement was an insufficient ground to grant a downward departure. *See United States v. Pressley*, 345 F.3d 1205, 1218-19 (11th Cir. 2003). The UN Special Rapporteur on torture Juan E. Méndez has put it this way: "'Segregation, isolation, separation, cellular, lockdown, Supermax, the hole, Secure Housing Unit … whatever the name, solitary confinement should be banned by States as a punishment or extortion technique.'" *Solitary Confinement*

*Should Be Banned in Most Cases, UN Expert Says*, UN News, Oct. 18, 2011.[23]
Jonathan has been frequently isolated and repeatedly swapped between institutions
while in a degraded mental state. The conditions he has been forced to endure support
a downward variance or probation sentence.

### C. This offense is outside the heartland of the present GSR given a number of mitigating factors.

The nature and circumstances of the present offenses favor a sentence below
the advisory guideline range. Notwithstanding the context under which this case
arose, this Court should not lose sight of the fact that, with respect to the behavior for
which Jonathan Munafo now stands convicted, the circumstances of Jonathan's
mental health make inescapable the fact that he was highly susceptible to being
influenced by the enormity of the crowd and those involved in more egregious conduct
at the Capitol on January 6, 2021.

Jonathan's convictions for civil disorder and assaulting Metropolitan Police
Department Officer Neil McAllister must similarly be viewed in the broader context
of the events taking place in Jonathan's life during the end of 2020 and January,
2021. In other words, Jonathan's solo attendance and the absence of any planning to
engage in nefarious behavior leads to the conclusion that this Honorable Court should look
beyond the technical prescriptions of the Guidelines and find that, in the circum-
stances of this case, Jonathan's conduct does not fall within the range of cases for

---

[23] *Available at* https://news.un.org/en/story/2011/10/392012-solitary-confinement-
should-bebanned-most-cases-un-expert-says.

which punishment of the magnitude reflected in the Guidelines calculations in the PSR is warranted.

There are several significant mitigating factors. First, Jonathan did not use a weapon or any special skill when he made contact with Officer McAllister; nor did he engage in any planning whatsoever. These are possible considerations at play any time the § 2A2.2 guideline is at work. And were it not for overlapping conduct related to the civil disorder charge, and the officer's official status, the guideline's higher offense level would not have been triggered absent a weapon.[24] Likewise a lack of physical injury is a mitigating aspect of the offense. The present guideline contemplates conduct far beyond illegal hooliganism in a protest that's gone too far. As the guideline background notes, it "covers felonious assaults that are more serious than other assaults because of the presence of an aggravating factor, *i.e.,* serious bodily injury; the involvement of a dangerous weapon with intent to cause bodily injury; strangling, suffocating, or attempting to strangle or suffocate; or the intent to commit another felony."[25] The background adds: "Such offenses occasionally may involve planning or be committed for hire." Yet, this offense occurred spontaneously by a young man in need of mental health care in an unusually crowded environment.

Finally, given his decompensation, while still culpable, Mr. Munafo has a diminished level of culpability given that he was, at the time, in a vulnerable mental

---

[24] USSG §2A2.2 app. n.1.
[25] USSG §2A2.2 Background.

state: he was, in the PSR's words, "not medicated, and he lacked stable housing, employment, and income." [26]

Thus, though Jonathan does not seek to minimize the seriousness of the charges of which he has been convicted—indeed, he is painfully aware of the severity of the situation—the nature and circumstances of the conduct at issue would be amply punished with a probationary sentence or, alternatively, one below the ultimate advisory range determined by the court.

### D. Jonathan needs treatment in the community and could suffer additional setbacks if transferred to the BOP.

#### 1. Jonathan's need for treatment is established.

A probationary or downwardly variant sentence will provide mental health care in the most effective manner. Jonathan's mental health is an additional factor weighing in favor of imposing a sentence below the advisory Guidelines range. § 3553(a)(2)(d) (a sentence should consider the need to provide medical care in the most effective manner). Even in the pre-*Booker* landscape, serious medical conditions provided the basis for a court to vary below a sentencing guideline range.

Courts have routinely found that a sentencing court is free to impose a non-guidelines sentence based upon the health needs of a defendant. *See, e.g., United States v. Davis,* 458 F.3d 491, 498 (6th Cir. 2006) ("court ... has a freer hand to account for the defendant's age in its sentencing calculus under § 3353(a) than it had before *Booker*".). Accordingly, as detailed in the PSR, it is respectfully submitted that Jon-

---

[26] PSR ¶182.

athan's mental health conditions warrant the imposition of a non-Guidelines sentence.

### 2.   Jonathan has achieved stability during treatment.

Jonathan's mental health has improved remarkably as this Court has personally observed during the detention hearing, status hearing, and at the change of plea hearing. As this Court observed in May 2022 once Jonathan began receiving regular care: "I'm really glad, Mr. Munafo, that you're getting some of that seen to and that you're in a much better position than you were. I think that that's terrific from lots of standpoints."[27] Much of this owes to treatment based on prescriptions[28] determined after Jonathan was released from the Washington State BOP facility, which had given him a combination of medications that made him feel worse. These differences are apparent in Paragraphs 117, 122 and 130 of the PSR.

### 3.   Jonathan has an imperfect yet established record of seeking help when needed.

This Court should resist speculation that Jonathan has not responded to prior interventions. While he has serious needs, the PSR documents numerous occasions where he proactively sought and received treatment in the community. PSR ¶¶ 97-117.

---

[27] ECF No. 28 at 10.
[28] PSR ¶130.

**4. Release after 29 months to start community treatment will not leave any goals of sentencing unmet.**

Release after 29 months does not undermine concerns including the seriousness of the offense, or deterrence, or promoting respect for the law. Respect for the law, however, is not furthered by rigid adherence to formulaic calculations, which is why the Court should consider the larger picture:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. **The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense.** Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

*United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (emphasis supplied). It is with the above-described considerations in mind that the Court is urged to conclude that, in this case, a sentence of probation and one below the advisory range is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment. § 3353(a)(2)(a).

Correspondingly, a below-Guidelines sentence would be sufficient to satisfy the need for the sentence imposed to provide both a general and specific deterrent. With

respect to the public at large, as indicated above, taking all of the circumstances of this case into account, no one could seriously contend that a sentence below the advisory Guidelines range would cause anyone to walk away from these proceedings believing that one can commit the offenses at issue here with impunity. Here, in a case that was more public than most cases, the loss of liberty for over two years under horrible conditions of confinement has served as significant punishment.

In light of the factors discussed that render this case outside the heartland of the run-of-the-mill case, it is respectfully submitted that a non-custodial sentence is appropriate for Jonathan. The nature and circumstances of the offense, and Jonathan's history and characteristics, all favor a sentence that provides punishment without further incarceration.

## CONCLUSION

For the foregoing reasons, we ask the Court to impose a non-Guidelines sentence of probation or time served with any conditions the Court deems reasonable under the circumstances.

**RESPECTFULLY SUBMITTED.**

**RACHEL BRILL**
Federal Public Defender,
District of Puerto Rico

**s/KEVIN E. LERMAN\***
Research & Writing Attorney
Tel. (787) 281-4922
E-mail: Kevin_Lerman@fd.org

**s/JOSEPH A. NISKAR**
Assistant Federal Public Defender
Tel: 787-474-6364
Email: Joseph_Niskar@fd.org

**\*** I CERTIFY that I e-filed this pleading, notifying the parties/government counsel.