**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 21-CR-330 (JEB)** |
| | : | |
| **JONATHAN JOSHUA MUNAFO,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Jonathan Joshua Munafo to a term of imprisonment of thirty-seven months. The government also recommends a three-year term of supervised release, $2,000 in restitution, and a $200 Special Assessment Fee ($100 for each count of conviction). As calculated by the government and the U.S. Probation Officer, Munafo has a total offense level of 17 and a criminal history category of III, resulting in a Guideline imprisonment range of thirty months to thirty-seven months. The government's request is at the high end of that range. This recommendation is warranted given Munafo's understated criminal history category that does not adequately account for ███████████████████████████ and two pending charges for violent crimes. The government's request is also warranted given his disturbingly violent acts— including the robbery in which Munafo stole a police riot shield from the hands of a police officer during the riot that is not a count of conviction in this case—that occurred near the Lower West Terrace Tunnel, the epicenter of extreme violence at the Capitol building on January 6, 2021. This recommendation also accounts for ████████████████████████████████████████ ██████. Without those considerations, the Government would have sought a longer period of

incarceration.

## I.      INTRODUCTION

The defendant, Jonathan Joshua Munafo, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Munafo is a thirty-six-year-old male with no family support and no stable residence who spent most of his time in the year preceding January 6, 2021, driving around the United States without a valid driver's license and in a borrowed car. Munafo focused on the areas where the former President would be speaking and campaigning. He slept in his car or camped out to get front row seats at the events. While doing this, Munafo engaged in increasingly erratic and violent behavior, racking up criminal and traffic offenses for which courts issued arrest warrants when he failed to appear. On January 5, 2021, while he was in North Carolina, Munafo made approximately 143 telephone calls to a non-emergency dispatch center in Calhoun County in south-central Michigan, during which he made several profane threats of violence against the dispatcher.

The next day, Munafo was in Washington, D.C., and joined the violent mob that attacked police officers in the area known as the Tunnel on the Lower West Terrace of the United States

---

[1] As of July 7, 2023, the approximate losses suffered because of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses because of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Capitol. While there, he punched a Metropolitan Police Department Officer and stole the officer's riot shield from him by ripping it from his hands. At another point in the afternoon, he took a flagpole and used it to strike a window of the Capitol several times.

Following his participation in the violent mob, Munafo left Washington, D.C., totaled the borrowed car, and made his way to California where he was again arrested, before finally making his way to Florida, where he was again arrested. Currently, Munafo appears to have at least three outstanding warrants for his arrest out of Newburyport, MA; Lynn, MA; and Washington, D.C., Superior Court.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 39, pp. 1-3, for a short summary of the January 6, 2021, attack on the United States Capitol by thousands of rioters. This attack was an effort to disrupt the peaceful transfer of power after the Presidential Election that took place on Tuesday, November 3, 2020.

### B.     Jonathan Joshua Munafo's Role in the January 6, 2021, Attack on the Capitol

Munafo is a sporadically employed and chronically homeless individual with a history of violence, ███████████████████████████. He has little to no support from family or other healthy social relationships. In the year preceding January 6, 2021, he appears to have dedicated himself to following the former President around the country, camping out for the various rallies and speeches. PSR ¶ 22. Beginning in July 2020, and while in Tumwater, Washington, Munafo had his first in a string of increasingly violent encounters with other individuals when he was the aggressor in a road rage incident. *Id*. at ¶ 51. Police officers would later find "law enforcement grade" pepper spray and spent ammunition shells in Munafo's car. *Id*.

Between September and November 2020, Munafo allegedly threatened to shoot another

individual at a rest stop, called an emergency line more than twenty times making violent and profane comments, and assaulted an elderly or disabled person, all in Massachusetts. *Id*. at ¶¶ 63-64. Warrants remain outstanding for those charges. In December 2020, Munafo traveled to Washington, D.C., where he was cited in D.C. Superior Court for simple assault. *Id*. at ¶ 65. A warrant remains outstanding in that case as well.

On January 6, 2021, Munafo was once again in Washington, D.C. He arrived on Capitol grounds at approximately the same time as the group of protestors that stayed for the entirety of the former President's speech before making their way to the Capitol. Gov't Ex. 1 shows Munafo on the West Lawn of the Capitol in a large crowd of people, some of whom were chanting, "Make a hole!" and "Move forward!". One individual shouted, "People have really invaded the Capitol! This is amazing! This has never happened before!"



**IMAGE 1:** *A screenshot from Gov't Ex. 1 (7 min. 15 sec.) showing Munafo when he made his way through a crowded West Plaza to the U.S. Capitol. Munafo held a flagpole with a flag attached.*

Unlike other rioters that made their way to the Senate Wing Door and entered the Capitol, Munafo made his way to the Lower West Terrace—the epicenter of the worst violence that took place at the U.S. Capitol on January 6, 2021. Once there, Munafo pushed and cajoled his way to

the Tunnel and went inside. The time was approximately 2:57 p.m. He did not make it very far

into the tunnel on his first attempt, but he appears to have gotten a gas mask and rushed back to

the front of the rioters in the Tunnel. As shown in a video filmed by another rioter, Munafo scurried

to the front of the line and, with what appears to be his hat in his hand, Munafo pointed aggressively

at and jabbed at the police officers who were battling to keep Munafo and the other rioters out of

the Capitol. Some Members of Congress and their staff were hiding in fear just a short distance

behind the Tunnel.

 

*IMAGES 2, 2a:* (left) A screenshot from Gov't Ex. 2 (08 min. 57 sec.) showing Munafo at approximately 2:57 p.m. when he pushed his way into the Tunnel despite the obvious signs of chaos and violence; and (right) a closeup of Munafo with his flagpole with a flag attached to it.

[THIS SPACE INTENTIONALLY LEFT BLANK]

 

**IMAGES 3, 3a:** *(left) A screenshot from Gov't Ex. 2 (12 min. 49 sec.) showing Munafo at approximately 3:01 p.m.—now wearing a gas mask—when he again pushed his way into the Tunnel, ran to the front line of the mob, and directly confronted the police officers; and (right) a closeup of the individual believed to be Munafo in a gas mask.*

 

**IMAGES 4, 4a:** *(left) A screenshot from Gov't Ex. 3 (03 min. 08 sec.) showing Munafo at the front line of the rioters when he pointed his finger at the officers and swung his arm down over the tops of their shields; and (right) a closeup of the individual believed to be Munafo.*

 

*IMAGES 5, 5a: (left) A screenshot from Gov't Ex. 3 (03 min. 39 sec.) showing Munafo when he retreated from the front line of the rioters, removed his gas mask, and fled back to the mouth of the Tunnel as other rioters shouted, "We need fresh people!"; and (right) a closeup of Munafo.*

After leaving the tunnel, Munafo moved to an area just south of the Tunnel. From there he saw members of the mob steal a shield away from the police officers fighting to protect the Tunnel, and Munafo cheered along with the rest of the rioters. The time was approximately 3:05 p.m.

[THIS SPACE INTENTIONALLY LEFT BLANK]

 

*IMAGES 6, 7: (left) A publicly available photograph[2] that shows Munafo when he raised his fist as rioters stole a U.S. Capitol Police riot shield from police officers; and (right) a screenshot from Gov't Ex. 4 (5 min. 15 sec.) showing Munafo as he cheered with his fist raised at approximately that same moment.*

Over the course of the next ten to fifteen minutes, Munafo attempted to scale the wall of the Capitol building next to the Tunnel. He then used two different poles to strike the window of office HT-2M of the Capitol. Munafo would often look back towards the crowd, shouting, chanting, and attempting to rile up the other rioters.

[THIS SPACE INTENTIONALLY LEFT BLANK]

---

[2] https://archive.org/details/XwgGbRFiWsdYLiAdS/XwgGbRFiWsdYLiAdS.jpg



**IMAGE 8:** *A screenshot from Gov't Ex. 5 (12 min. 37 sec.) that shows the moment Munafo attempted to climb the wall of the Capitol. He was unsuccessful.*



**IMAGE 9:** *A screenshot from a Gov't Ex. 6 (0 min. 00 sec.) that shows one of the times that Munafo struck the window of Capitol office HT-2M and yelled to the crowd, riling them up.*



**IMAGE 9a:** *A close-up of Munafo from Image 9.*

Moments later, Munafo struck other parts of that same window, but with a different

flagpole, one that appeared to be made of metal instead of wood.



**IMAGE 10:** *A publicly available photograph[3]  showing when Munafo struck the window of Capitol office HT-2M with what appears to be a metal flagpole.*

---

[3] https://archive.org/download/DyabPnh3sHBSx6pJ9/DyabPnh3sHBSx6pJ9.jpg



***IMAGE 11:*** *A screenshot from Gov't Ex. 7 (1 min. 06 sec.) showing when Munafo repeatedly struck the windows of HT-2M with a metal flagpole.*



***IMAGE 12:*** *A screenshot from Gov't Ex. 8 (00 min. 13 sec.) showing another angle of the moment when Munafo repeatedly struck the windows of HT-2M with a metal flagpole. Munafo's attempts to smash out the windows of the Capitol took place at approximately 3:14 p.m.*

At around this time, rioters dragged Metropolitan Police Department Officer Michael Fanone out of the Tunnel and into the mob. Rioters beat and tased Officer Fanone before he was able to return to the relative safety of the police line. While Munafo apparently did not participate in these attacks against Officer Fanone, he did take advantage of the chaos surrounding the event.

Immediately after Officer Fanone returned to the Tunnel at approximately 3:21 p.m., Munafo, who was standing nearby, viciously sucker-punched another MPD Officer (hereinafter, Officer N.M.) twice while attempting to rip that officer's riot shield away from him. The second punch from Munafo appears to have caused Officer N.M.'s head to snap back.[4] Munafo then took Officer N.M.'s shield and slunk away into the crowd, leaving the officer without a shield and vulnerable to attacks from other rioters.



***IMAGE 13:*** *A screenshot from MPD Officer N.M.'s body-worn camera at 3:21 p.m. showing Munafo punching Officer N.M. for the first time.*

---

[4] *See also* https://archive.org/details/20210106-152104 (video) (0 min. 13 sec.); https://archive.org/details/LBzkgf8ihL3Duwi9H (video) (1 min. 47 sec); and Gov't Ex. 2 (32 min. 20 sec).



**IMAGE 14:** *A screenshot from MPD Officer N.M.'s body-worn camera at 3:21 p.m. showing the moment when Munafo punched Officer N.M. a second time.*



**IMAGE 15:** *A screenshot from MPD Officer N.M.'s body-worn camera at 3:21 p.m. showing the moment that Munafo robbed Officer N.M.'s of his riot shield, ripping it out of his hands.*



**IMAGE 16:** *A screenshot from MPD Officer N.M.'s body-worn camera at 3:21 p.m. showing Munafo after he twice struck Officer N.M. and then robbed him of his riot shield.*




**IMAGES 17, 18:** *(left) A publicly available photograph[5] of Munafo jumping up to punch MPD Officer N.M. as he stole Officer N.M's riot shield; and (right) a screenshot from a publicly available video[6] (Gov't Ex. 9) (00 min. 54 sec.) showing Munafo retreating into the crowd on the Lower West Terrace with the riot shield he just stole from Officer N.M.*

---

[5] https://archive.org/details/GxcgxrwBXyXsgMkmp/GxcgxrwBXyXsgMkmp.jpg (photograph)

[6] https://web.archive.org/web/submit?url=https://video.parler.com/Kd/e1/Kde14bJTM56p.mp4 (video) (0 min. 28 sec.)

### III.    THE CHARGES AND PLEA AGREEMENT

On April 28, 2021, a federal grand jury returned an indictment charging Jonathan Joshua Munafo with ten counts, including Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a) (1). On April 21, 2023, Munafo pleaded guilty to those two offenses pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Munafo now faces sentencing on Civil Disorder and Assaulting, Resisting, or Impeding Certain Officers. As noted by the Plea Agreement and the Presentence Investigation Report issued by the U.S. Probation Office, as to the conviction for Civil Disorder, Munafo faces up to five years imprisonment, a fine of up to $250,000, a term of supervised release of up to three years, and a mandatory special assessment of $100.As to the conviction for Assaulting, Resisting, or Impeding Certain Officers, Munafo faces up to eight years imprisonment, a fine of up to $250,000, a term of supervised release of up to three years, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The PSR includes one error in that it does not include a Guidelines analysis for both Counts—Count One and Count Two—to which Munafo pleaded guilty. *See* PSR ¶¶ 30-45.[7] That Guidelines analysis, as agreed upon by the parties and included in the PSR at ¶ 7, follows:

---

[7] U.S.S.G. §§ 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (*see* PSR ¶ 39) that Counts [X] and [Y] group—a conclusion with which the government agrees—

### A.    Count One: 18 U.S.C. § 231 (a)(3)

**Base Offense Level:**
     U.S.S.G. § 2A2.4(a)         Obstructing or Impeding Officers         10

**Specific Offense Characteristics:**
     U.S.S.G. § 2A2.4(b)(1)(A)    Offense Involved Physical Contact       + 3

**Cross-Reference:**
     U.S.S.G. § 2A2.4(c)(1)       If Aggravated Assault[8], Apply § 2A2.2

**Base Offense Level (Cross-Reference):**
     U.S.S.G. § 2A2.2             Aggravated Assault                      14

**Adjustments:**
     U.S.S.G. 3A1.2               Official Victim                         + 6

                                **Total Offense Level**      **20**

### A.    Count Two: 18 U.S.C. § 111(a)(1)

**Base Offense Level:**
     U.S.S.G. § 2A2.4(a)         Obstructing or Impeding Officers         10

**Specific Offense Characteristics:**
     U.S.S.G. § 2A2.4(b)(1)(A)    Offense Involved Physical Contact       + 3

**Cross-Reference:**
     U.S.S.G. § 2A2.4(c)(1)       If Aggravated Assault[9], Apply § 2A2.2

**Base Offense Level (Cross-Reference):**
     U.S.S.G. § 2A2.2             Aggravated Assault                      14

**Adjustments:**
     U.S.S.G. 3A1.2               Official Victim                         + 6

                                **Total Offense Level**      20

---

but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

[8] U.S.S.G § 2A2.2, App. Note 1, defines Aggravated Assault as "a felonious assault that involved [ . . . ] (D) an intent to commit another felony." In this case, the other felony that the defendant intended to commit while assaulting a police officer from the Metropolitan Police Department is a violation of 18 U.S.C. § 231(a)(3).

[9] *See* fn. 8.

Regarding grouping, the PSR correctly recognizes that Counts One and Two group because the counts involved the same victim (Officer N.M.) and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. U.S.S.G. §3D1.2(b). Because the counts are grouped pursuant to U.S.S.G. §3D1.2(a) and (b). the applicable offense level is the highest offense level of the counts in the Group. ECF No. 37, p. 4; PSR ¶¶ 34-35.

The U.S. Probation Office calculated Munafo's criminal history as category III. PSR ¶¶ 46-53. The government agrees that the appropriate category for the Munafo is III. ECF No. 37, p. 4. At the time of the Plea Agreement, Munafo agreed with that category as well, but now argues that "three of those points—applied since Mr. Munafo has been in custody on this case—should not be counted". ECF No. 41, p. 1. According to Munafo, it is "unclear" whether he has served any portion of the Michigan Sentence. ECF No. 41, pp. 2-6. Munafo therefore believes that his sentence in the Michigan case is not a "prior sentence" under U.S.S.G. § 4A1.1, and therefore should not be counted in calculating his criminal history category. *Id*. Consequently, he argues, his CHC should be I. *Id*. at 6.

This claim is meritless. "The term 'prior sentence' means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense." U.S.S.G. § 4A1.2(a)(1). The commentary limits that definition by stating "To qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment on such sentence (or, if the defendant escaped, would have served time)." U.S.S.G. § 4A1.2, cmt. n. 2. Regardless of whether that commentary is authoritative here, *see United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018) (commentary to career offender

Sentencing Guideline impermissibly expanded definition of "controlled substance offense"), Munafo unquestionably has served "a period of imprisonment" on the Michigan Sentence.

The judge in the Michigan case sentenced Munafo to 24 months' imprisonment more than twenty-two months ago, on October 26, 2022. PSR ¶ 52, Following that sentencing and on November 8, 2022, the Federal Bureau of Prisons Designation and Sentence Computation Center prepared an Independent Sentence Computation (PSIN) for the sentence in the Michigan case. Gov't Ex. 10. In the PSIN, the BOP granted Munafo 562 days of credit on his 24-month sentence in the Michigan case. The PSIN also listed his Statutory Release Date for the Michigan case as December 25, 2022. That document conclusively establishes that the Michigan Sentence was a "prior sentence" under U.S.S.G. § 4A1.2(a), and the Probation Office properly included it in calculating Munafo's criminal history category. *See* Addendum to PSR, ECF No. 43, pp. 49-50.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the 3553(a) factors weigh in favor of a term of incarceration at the high end of the range prescribed by the U.S. Sentencing Guidelines.

### A.   Nature and Circumstances of the Offense

Despite his relatively young age, Munafo has now been an active participant in numerous troubling, violent, and community endangering events, to include the insurrection at the United States Capitol. As shown in Section II(B) of this memorandum, Munafo's felonious conduct on January 6, 2021, was part of a massive riot that succeeded in obstructing and almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Munafo was at the epicenter of the most violent and abhorrent behavior that took place on that day. Munafo cheered with the crowd, shouted, and yelled encouragement, attempted to climb a wall, and used two

different flagpoles to participate in the vandalism and attempted smashing of the Capitol's windows. Munafo also took advantage of the distraction caused by the crowd's horrific assault of former MPD Officer Fanone to punch MPD Officer N.M. twice and steal away from him his riot shield, leaving him exposed to the violent crowd of the Lower West Terrace. The nature and circumstances of Munafo's offenses were of the utmost seriousness, and fully support the government's recommended sentence of a term of incarceration of thirty-seven months.

### B.      Munafo's History and Characteristics

Munafo has a long and complex personal and criminal history that is recounted at length in the PSR. As the district court in Munafo's Michigan case recently observed, "the criminal history of Mr. Munafo shows some—shows criminal contempt, shows violence, shows weapons. And so, protecting the public from someone who we have no idea what will set him off is something that the Court takes very, very seriously." 21-CR-99 (JTN), ECF No. 77, p. 32, attached as Gov't Ex. 11. This Court should also take these same characteristics of Munafo "very seriously" and sentence Munafo to a term of incarceration of thirty-seven months. Munafo's prior convictions and arrests include the following:

- In October 2003, Munafo was charged with and later pleaded guilty to Second Degree Menacing with a Weapon, a misdemeanor offense, for attacking his father with a metal vacuum handle. He was sentenced to time served. PSR ¶ 47.

- In October 2003, Munafo was charged with and later pleaded guilty to Second Degree Criminal Contempt for violation of an Order of Protection, a misdemeanor offense. He was sentenced to a term of probation that was revoked once. *Id.* at ¶ 48.

- In October 2003, Munafo was arrested and charged with Criminal Contempt for Violation of an Order of Protection. This case was dismissed when Munafo plead guilty to the above case. *Id.* at ¶ 56.

- In 2007, Munafo was arrested and charged with Fourth Degree Criminal Possession of a Weapon, Attempted Second Degree Menacing, and other related charges. This case was ultimately dismissed as covered by the 2008 charges and plea described below. *Id.* at ¶ 57.

- In 2008, Munafo was again charged with and pleaded guilty to Second Degree Criminal Contempt for violation of an Order of Protection. Munafo was sentenced to 90 days jail. *Id*. at ¶ 49.

- In 2015, Munafo was charged with and pleaded guilty to Disorderly Conduct in full satisfaction of a docket that included Resisting Arrest and Aggravated Unlicensed Operation of a Motor Vehicle. *Id*. at ¶ 50.

- In January 2020, Munafo was arrested in Massachusetts after being found operating a motor vehicle when his license was suspended in both Massachusetts and New York. ███████████████████████████████████████ and charges were eventually dismissed. *Id*. at ¶ 58.

- In July 2020, Munafo was arrested after a citizen called to report Munafo for pointing what they believed to be a small firearm or can of mace at them after a traffic dispute. Officers found that Munafo had no valid driver's license. They could also see a can of mace in the car, but Munafo refused to allow them to retrieve it. The complainant's vehicle was occupied by an elderly woman and two small children, in addition to the driver. After obtaining a search warrant, the officers retrieved a can of "law enforcement grade pepper spray." There were also several spent 9-millimeter and 5.56 caliber ammunition shells in Munafo's car. Munafo pleaded guilty to Displaying a Weapon, a misdemeanor offense, in full satisfaction of charges that included Driving While Suspended. Munafo was also ordered to not commit any other criminal offenses for at least two years. *Id*. at ¶ 51. He did not abide by that court order. He did not even try.

- In September 2020, Munafo was arrested and charged in Massachusetts with Assault of an Elderly or Disabled Individual as well as Unlicensed Operation of a Motor Vehicle. As described in the PSR, Munafo is alleged to have lied to police officers, told not to drive the car anymore, and to appear before a judge as ordered. Munafo drove the car away and did not appear as ordered. Later that month, Munafo repeatedly called the Massachusetts State Police Newbury Post emergency line, harassing and threatening anyone that spoke with him. A warrant is outstanding in this case. *Id*. at ¶ 63.

- In November 2020, Munafo was arrested and charged in Massachusetts with Assault of a Police Officer, and other Assault Counts for several victims. After being arrested ████████████████████████████████, Munafo assaulted the police officers assigned to guard him ███████████. He also called the officers various racial and ethnic slurs. Munafo failed to appear as ordered in that case and a warrant is outstanding. *Id*. at ¶ 64.

- In December 2020, Munafo was arrested in Washington, D.C., and charged with Simple Assault after advancing on counter protestors and sparking a taser. A warrant is outstanding in the case. *Id*. at ¶ 65.

- In January 2021, Munafo was arrested in California for fighting. He spent one day

in jail in relation to this case, for which he has received one day credit on the PSIN. No further action has been taken and no disposition is known. PSR ¶ 60.

- In April 2021, Munafo was arrested for the federal criminal case out of the WDMI. Munafo plead guilty to a felony violation of making Interstate Threatening Communications. PSR ¶ 52. Munafo has completed the imposed 24-month sentence of incarceration and will commence serving the three-year term of supervised release once he is released on this case. Gov't Ex. 10.

- In May 2021 and while in the custody of the Federal Bureau of Prisons, Munafo was charged with a Prisoner Placing a Bodily Fluid on a Government Employee. This case was later dismissed. PSR ¶ 62.

Much of Munafo's personal and family circumstances, as described in the PSR, are tragic. PSR ¶¶ 67-88. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████. Munafo

became violent, defiant, and noncompliant towards authority, including his parents, grandparents,

school administrators, doctors, therapists, other medical professionals, and law enforcement

officials. A picture also emerges of someone that ██████████████████████████████

████████ but knows what to say to get what he wants. ██████████████████████████

████████████████████████████████████████████████.

For example, in 2009, ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ but no matter the diagnosis, Munafo repeatedly and

consistently failed to follow through on any treatment plans or recommendations for self-

improvement, for example, participating in therapy or getting and maintaining a steady job. He ended one term of employment following "a verbal altercation with a man over a parking spot." *Id*. at ¶ 103. Again, in late 2009, health care providers reported that Munafo "failed to follow through with his transition to other services as he did not connect with providers." *Id*. at ¶ 104.

Fast forward to 2014 when Munafo was again homeless, unemployed, and hostile to health care providers. *Id*. at ¶ 106. Health care providers reported that he was "superficially cooperative" with ██████████████████ *Id*. In 2015, ██████████████ Munafo "was also known to escalate quickly and become aggressive." ████████████████████████████ ████████ *Id*. at ¶ 108.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ he returned to the same hospital and was noted to be "savvy to the medical system" and using "medical terminology." *Id*. at ¶ 112. ████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ One department official noted that Munafo had a habit of "making 'thinly veiled threats in attempts to get his needs met.'" *Id*. ████████

████████████████████████████



The last lines of paragraph 124 are telling. "Mr. Munafo asserted he 'knows what to say,' ███████████████████████████████ He also stated he would cause additional work for staff. He was coherent but easily flustered when challenged, and very focused on dynamics of power and control." *Id*. When he felt like his demands were not being met, he urinated on the floor, threw things at staff, and felt such actions were "justified." *Id*. at ¶ 125. He later admitted that he used ███████████ as a "power play." *Id*. at ¶ 126. ███████████████████████████████ ███████████████████████████████

One clinician expressed a belief that Munafo ███████████ when he made the phone calls on January 5 and went to the U.S. Capitol on January 6, 2021, but also stated that █ ███████ did "not excuse his behavior." *Id*. at ¶ 128.

While it sometimes appears as though Munafo has been making improvements, it must be noted that on July 10, 2023, a Corporal at the Correctional Treatment Facility in Washington, D.C., made an All-Available Staff emergency call for a group of inmates that were fighting. While

investigation is ongoing, it appears that Munafo is alleged to have been part of a group of twelve inmates that ganged up on and assaulted two other inmates. Because of his involvement, Munafo has been rehoused and charged with Fighting.

Munafo's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came after a long series of violent offenses and behavior that shows Munafo will do almost anything to anyone that stands between him and what he feels he deserves. Munafo's criminal history demonstrates a troubling propensity towards violence, especially towards strangers and authority figures. Munafo's history and characteristics, including his history of arrests and convictions for violent assaults and history of violent rhetoric, weigh heavily in favor of a lengthy term of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Munafo's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] Over 32 months after January 6, 2021, there is evidence that government's uniform approach to sentencing has achieved and will continue to achieve its desired general deterrence effect. As an example, Rachel Kleinfeld, a senior fellow in the Democracy, Conflict and Governance Program at the Carnegie Endowment for

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

International Peace, recently spoke with the New York Times, about the violent rhetoric but lack of violence in Miami, Florida, on Tuesday, June 13, 2023. "One reason for the absence of conflict in Miami, Ms. Kleinfeld wrote in an email, was that the prosecutions of Jan. 6 protesters—which now amount to more than 1,000 criminal cases—**have had 'a real deterrent effect'** on those who might have once considered violence."[11]

The demands of general deterrence continue to weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs heavily in favor of a lengthy term of incarceration.

First, Munafo's history of arrests and convictions shows a clear pattern of manipulative and assaultive behavior. *See* Section VI(B), *supra.* Second, many health care providers over the past decade have recognized Munafo's manipulative nature and ability to know what he needs to say to get what he wants.

Munafo has yet to truly express remorse for his actions or recognition of wrongdoing for January 6, 2021. In the PSR, he described January 6, 2021, simply as a "crazy day." PSR ¶ 29. Despite his averred plans to surround himself with more supportive people, as recently as two months ago, he was charged with taking part in what appears to be group faction-related violence.

Another of the considerations under 3553(a) is the need for the sentence imposed to protect the public from further crimes of the defendant, and the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional

---

[11]   https://www.nytimes.com/2023/06/15/us/politics/trump-protests-proud-boys.html   (emphasis added).

treatment. Given Munafo's long history of aggression and violence towards family, hospital staff, medical professionals, and complete strangers, a substantial term of incarceration would protect the public from future crimes of Munafo.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.  Unwarranted Sentencing Disparities

18 U.S.C. § 3553(a)(6) directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord. United*

*States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, 21-CR-198 (TSC) (D.D.C.), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[12]

---

[12] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-CR-31 (FYP) (D.D.C.), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[13]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The case of Matthew Beddingfield (22-CR-66 (CJN)) provides a suitable comparison to this case. Beddingfield was much younger than Munafo on January 6, 2021, but he was already on conditions of pretrial release for charges of attempted murder when he participated in the storming of the Capitol and assaulted a police officer in the West Plaza with a flagpole. Beddingfield then entered the Capitol and walked around for several minutes, participating in another violent push against police officers before being led out of the Capitol's North Door. Unlike Munafo, Beddingfield was younger, had more significant family support, a stable job, friends, and no known violence against random members of the public or against health care workers. Munafo's attacks, though he used his fists and not a flagpole, were arguably more personal given that he had to jump out of the crowd and punch from arm's length a police officer that was attempting to help a fallen comrade return to safe harbor. Munafo also stayed at the epicenter of violence while at the

---

[13] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Capitol. Beddingfield pleaded guilty to 18 U.S.C. § 111(a) and Judge Nichols sentenced him to a term of 38 months' incarceration. Across the board, given Beddingfield's thirty-eight month sentence, a thirty-seven month sentence for Munafo would not create an unwarranted disparity.

Another case for comparison is *United States v. Mikhael Slye*, 22-CR-334 (JEB). Like Munafo, Slye pleaded guilty to assaulting a police officer on January 6, 2021. Instead of using his fists, Slye threw a bike rack at a police officer, causing him to trip and suffer injuries. Slye's actions came at a place of violence, the North Door, but not the epicenter of violence that was the Tunnel. This Court found that Slye's family support to be significant and mitigating. Munafo has none. It also found Slye's medical condition (epilepsy) to be a reason for a shorter term of incarceration. Munafo, on the other hand, has proven that when left to his own devices, he does not follow court orders or treatment and medication schedules. Slye had stable employment and a business. Munafo has never had a stable job, nor has he ever been a contributing member of society. This Court also found that the risk of recidivism for Slye was slim, so specific deterrence was not a factor. For Munafo, specific deterrence is a significant factor. Given Munafo's history of refusing to improve himself, refusing to get a job, refusing to engage meaningfully in self-care or self-improvement, and his propensity to belittle, berate, and assault those that do not give him what he wants, there is a significant likelihood that Munafo will reoffend.

This Court sentenced Slye to a term of imprisonment of thirty months. This Court should impose an appropriately longer term of incarceration here because of Munafo's more significant aggravating factors and his significantly less significant mitigating circumstances.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[14] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer N.M., did not suffer bodily injury because of Munafo's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Munafo must pay $2,000 in restitution, which reflects in part the role Munafo played in the riot on January 6, 2021.[15] ECF No. 37, pp. 9-10. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 14, 2022. *Id*. at 9. (As noted above in footnote 1, the amount of the damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Munafo's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. PSR ¶ 178.

---

[14] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[15] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of a term of imprisonment of thirty-seven months, a three-year term of Supervised Release, $2,000 in restitution, and a $200 Special Assessment Fee ($100 for each count of conviction).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   _____
Sean P. Murphy
Assistant U.S. Attorney